# M A N D A T E

### THE SUPREME COURT OF THE STATE OF DELAWARE

To: Superior Court of the State of Delaware in and for Sussex County:

**GREETINGS:**

WHEREAS, in the case of:

STATE OF DELAWARE
vs.
CR.A.ID No. 0010006075
ALONZO I. CANNON

a certain judgment or order was entered on the 22nd day of June, 2001 which reference is hereby made; and

WHEREAS, by appropriate proceedings the judgment or order was duly appealed to this Court, and after consideration has been finally determined, as appears from the opinion or order of this Court filed on January 31, 2002, a certified copy of which is attached hereto;

ON CONSIDERATION WHEREOF IT IS ORDERED AND ADJUDGED that the matter be and it is hereby affirmed.

SIGNED, SEALED AND ATTESTED BY:

Cathy L. Howard
Clerk of the Supreme Court

Issued: February 19, 2002
Supreme Court No. 298, 2001

05-577



FILED
AUG -8 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

pg. 44

10/15/2000 | Troop 4 State Police | Complaint 05-00-301503

## Witness Information

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 003 | [redacted] | [redacted] | | | | |
| 004 | Child | [redacted] | Female | Black | 15 | 12/03/1984 |
| 005 | Person Contacted | [redacted] | Female | Black | | |
| 006 | Person Contacted | [redacted] | Female | Black | | |

## Investigative Narrative

ON 101000, MEMBERS OF THE GOVERNOR'S TASK FORCE ATTEMPTED TO DO A CURFEW CHECK ON ALONSO CANNON AT 1903 CARVEL GARDENS. HE WAS NOT AT HIS RESIDENCE AT 2358 HOURS. PO JONES ADVISED THAT HE KNEW OF ANOTHER LOCATION IN LITTLE CREEK APARTMENTS WHERE DEFENDANT CANNON COULD BE RESIDING. AT 0015 HOURS ON 101100 PO JONES CONTACTED W-1 [redacted] AT [redacted]. SHE ADVISED THAT DEFENDANT CANNON WAS NOT THERE AND GAVE US CONSENT TO SEARCH THE RESIDENCE FOR HIM. W-1 [redacted] ADVISED THAT SHE WAS JUST BABY SITTING HER CHILDREN. W-1 [redacted] WALKED US TO THE FIRST BEDROOM AND OPENED THE DOOR. I COULD TELL FROM HER EXPRESSION THAT SOMETHING SURPRIZED HER IN THAT ROOM. SHE WALKED AWAY FROM THE ROOM AND CPL WARREN AND I ENTEREDTHE ROOM. I ASKED WHO WAS IN THE BED AND SHE SAID HER DAUGHTER AND HER BROTHER. I SHINED MY LIGHT ON THE SUBJECTS IN THE BED. I ASKED THE BLACK MALE WHO WAS LYING IN THE BED NODE, WHAT HIS NAME WAS. HE STATED NATE. I ASKED HIM IF HE HAD SEEN ALONZO CANNON AND THAT HE LOOKED A LOT LIKE HIM. HE AGAIN STATED THAT HIS NAME WAS NATE. I ASKED FOR SOME IDENTIFICATION AND HE BEGAN TO GET DRESSED. DEFENDANT CANNON ADVISED THAT HE WOULD TELL ME WHO HE WAS OUTSIDE. AT THISTIME HE WAS PLACED IN HANDCUFFS AND TURNED OVER PO TIM JONES. CPL WARREN PICKED-UP A GREY JACKET LYING BESIDE THE BED. THIS JACKET CONTAINED A LARGE AMOUNT OF MARIJUANA AND COCAINE IN THE POCKET. THIS WAS LOCATED AT 0020 HOURS. CPL WARREN AND I HAD A CLOSED DOOR CONVERSATION WITH [redacted] AND [redacted] ABOUT [redacted] AGE AND THE INCIDENTS THAT OCCURRED IN THE BEDROOM. [redacted] ADVISED THAT SHE WAS 16 AND THAT SHE SNEAKED DEFENDANT CANNON IN THE BEDROOM AND THAT HE WAS WEARING THE GREY JACKET. SHE ADVISED THAT HE ARRIVED AROUND 1000 PM. SHE ADVISED THAT SHE SAW HIM PLACE THE JACKET WHERE WE FOUND IT. DEFENDANT CANNON READ HIS RIGHTS AT 0030 HOURS. DEFENDANT CANNON ADMITTED THAT IT WAS HIS JACKET AS WE BEGAN TO QUESTION [redacted] ABOUT THE POSSESSION OF THE JACKET.

DEFENDANT CANNON WAS TAKEN FROM THIS LOCATION TO HIS 1903 CARVEL GARDENS APARTMENT. PO JONES DID AN ADMINISTRATIVE SEARCH. DEFENDANT CANNON WAS TAKEN BACK TO TROOP 4 WHERE HE WAS INTERVIEWED ABOUT THE JACKET AND THE DRUGS. HE ADVISED THAT THE JACKET AND THE DRUGS WERE HIS. HE ADVISED THAT HE HAD ABOUT 4 NICKLE BAGS OF MARIJUANA AND AN UNKNOWN AMOUNT OF COCAINE. HE ADVISED THAT HE BOUGHT IT IN WILMINGTON. CPL JOHN MESSICK FIELD TESTED AND WEIGHED THE DRUGS. BOTH FIELD TESTED POSITIVE. THE MARIJUANA WEIGHED 29.5 GRAMS AND WAS BAGGED IN 12 SEPARATE BAGGIES. THE COCAINE WEIGHED 4.5 GRAMS AND WAS ALSO BAGGED IN 12 SEPARATE BAGGIES. THE LOCATION FROM WHICH THE DRUGS WERE FOUND WAS WITHIN 1000 FEET OF THE WEST LAUREL SCHOOL. DEFENDANT CANNON WAS ARRAIGNED IN FRONT JUDGE RUFFIN AND WAS COMMITTED TO SCI ON A $23,000.00 SECURED BOND.

ON 101100 AT 1730 HOURS I INTERVIEWED [redacted] AND [redacted]. [redacted] GAVEME PERMISSION TO SPEAK TO [redacted] BECAUSE SHE IS [redacted] GUARDIAN. [redacted] ADVISED THAT DEFENDANT CANNON WAS SNEAKED INSIDE THE APARTMENT. [redacted] ADVISED THAT SHE WAS IN CHARGE OF THE APARTMENT AT THAT TIME AND GAVE US CONSENT TO SEARCH FOR ALONSO CANNON. [redacted] ADVISED THAT DEFENDANT CANNON WAS WEARING THE GREY JACKET AND PLACED BESIDE THE BED WHERE WE LOCATED IT. [redacted] ADMITTED TO HAVING SEXUAL RELATIONS WITH DEFENDANT CANNON. THIS INVESTIGATION WAS TURNED OVER TO LAUREL POLICE DEPARTMENT OFFICER SIMMONS. LT RICHARDSON WAS CONTACTED ON 101100 AND ADVISED THAT OFFICER SIMMONS WAS ALREADY DOING AN INVESTIGATION ON DEFENDANT CANNON AND [redacted]. AN ASSIST OTHER AGENCY REPORT WAS DONE AND SENT TO OFFICER SIMMONS. 0500301506.

| Reporting Officer | Supervisor Approval |
|---|---|
| CPL LAYFIELD -3892 | MONROE B HUDSON PSPT719 Date 10/24/2000 1332 |

pg 45

1             I asked the female that was in the bed, the juvenile, after her

2   mother said that we could speak with her. She advised that the jacket was his

3   and that he was wearing it when he came into the house and that she had

4   actually snuck him into the bedroom with her and that she saw him wear the

5   jacket and take the jacket off and place it in the same location that we recovered

6   it in that bedroom.

7             Q.      Okay. What was recovered out of the jacket?

8             A.      Once it was taken back to Troop 5, it was found to

9   be twelve separate bags of marijuana. It field-tested positive for marijuana. And

10  it was bagged in twelve separate baggies and they had a total weight of 29.5

11  grams.

12            Also in that same bag was twelve smaller baggies of powder

13  cocaine. It was field-tested positive at the troop and was weighed and weighed

14  4.5 grams.

15            Q.      Okay. Let me slow you down a little bit. The

16  marijuana, based on your training and experience in the Governor's Task Force,

17  can you draw any conclusions based on the possession of that substance by Mr.

18  Cannon?

19            A.      Yes. It was clear to me that that was much more

20  than personal use. That was he was in possession of it and that he was in

21  possession of it with intent to deliver. By the shear amount and also the

1   packaging of it. It was packaged in twelve separate, separate baggies, all

2   approximately the same size. And from my experience on the road and also

3   from an interview done with defendant Cannon at the troop, they're classified as

4   nickel bags of marijuana.

5          Q.   He referred to them later in an interview as nickel

6   bags?

7          A.   Later at the troop he was interviewed about the

8   drugs. He had admitted to the possession of the jacket, after Miranda, at the

9   scene. He was taken back to the troop in an interview more in depth about the

10  drugs that were located. He admitted that the drugs were his, that he had

11  purchased them in Wilmington and he thought he had at least four nickel bags of

12  marijuana and that he was unsure of the amount of cocaine that he had in his

13  possession.

14         Q.   Okay. The cocaine you tested, is that consistent

15  with standard operating procedures and it tested positive for cocaine?

16         A.   That's correct.

17         Q.   And you said twelve baggies, individual baggies?

18         A.   Yes. It was in twelve separate smaller plastic

19  baggies. Again, the same as the marijuana, the shear amount of this was much

20  more than personal use. It was clear to me that he was in possession of it with

1   intent to deliver it and it was packaged in twelve separate baggies indicative of
2   drug sales.
3           Q.      Based on your training and experience, what is
4   the street value of the cocaine that Mr. Cannon had in his possession?
5   Approximately?
6           A.      Approximately over $300 worth is what he may
7   pay to purchase that, but he could make I would say up to $450, $500 off the
8   amount that he had in his possession.
9           Q.      So based on your training and experience both
10  the marijuana and the cocaine were possessed with the intent to deliver?
11          A.      That's correct.
12          Q.      Officer, the area where the cocaine and marijuana
13  were seized, are you familiar if any schools are located in that area?
14          A.      Yes, I am. I believe it is the Laurel, West Laurel
15  School is directly across the street from Little Creek Apartments. My supervisor,
16  Monroe Hudson, who spent several years in the Drug Unit has advised us that
17  that complex is well within one hundred feet of the property of that school. And
18  also that the room that we were at was within two hundred to three hundred feet
19  of the property of that school and well within eight hundred feet of the actual
20  building complex of that school.

1    THE COURT: All right. Any argument?

2    All right. On the possession with intent to deliver, I find the

3    State has established by a preponderance of the evidence that there is probable

4    cause to hold Mr. Cannon on the possession with intent, the possession within a

5    thousand feet of a school. And I'm assuming both of those charges, one deals

6    with the marijuana, one deals with the cocaine, is that the theory behind two

7    separate charges on that?

8    MR. GELOF: That's correct, Your Honor.

9    THE COURT: And the maintaining, what is the basis for the

10   maintaining charge, please?

11   MR. GELOF: I'm not aware of a maintaining charge. Your

12   Honor, I'm—

13   THE COURT: Am I reading it incorrectly off of the—

14   MR. GELOF: The warrant I had and I proceeded on, Your

15   Honor, is two charges of possession with intent to deliver cocaine and marijuana

16   and a charge of possession within 1000 feet of a school, one for marijuana, and

17   one for cocaine.

18   (WHEREUPON, A DISCUSSION WAS HELD OFF THE

19   RECORD).

20   MR. GELOF: Well, as far as the felonies go. I think there

21   are two other misdemeanors, Your Honor, that have been addressed.

1	THE COURT: All right. Am I looking at this calendar wrong
2	and if there is a problem in the system let's clear it up right now. Mr. Gelof says
3	that there is a possession with intent to deliver on the cocaine and on the
4	marijuana.
5	MR. GELOF: Your Honor, I think what may have
6	occurred—
7	THE COURT: And I have a maintaining or a manufacturing,
8	delivering— Is it just the wording, Madam Clerk?
9	MR. GELOF: That's what it is, Your Honor. I have seen that
10	occur. It is under the proper section of 16, 4752.
11	THE COURT: All right. I just want to make sure I'm clear.
12	Probable cause on the felony drug charges. The matter will
13	proceed to Grand Jury for indictment.
14	MR. GELOF: Thank you, Your Honor.
15	- - - -

LINDA A. LAVENDER
Official Court Reporter

Pg. 50

```
 1   questioning as to her age and what was going on
 2   between the two in the bedroom that night.
 3       Q    In reference to the drug part of your
 4   investigation, what happened next?
 5       A    After speaking with Ms. Barns and
 6   Miss Smalls, I exited the room, and I walked directly
 7   up to the defendant, and I looked at my watch and
 8   explained to him what time it was.  At this time, I
 9   read the defendant his Miranda rights.
10       Q    What exactly did you read to him at that
11   point?
12       A    Usually we -- I have a card in my uniform
13   that I read directly from, but my card states that he
14   has a right to remain silent.  Anything he says can
15   and will be used against him in a court of law.  He
16   has a right to talk to a lawyer and have a lawyer
17   present with him while he was being questioned.  He
18   may stop at any time during the questioning.  It runs
19   a little smoother.  I explained to him he has a right
20   to remain silent.  Anything he says can and will be
21   used --
22           THE COURT:  Slow down.
23       A    He has a right to remain silent.  Anything
```

LAYFIELD - Direct

1  he says can and will be used against him in a court
2  of law.  He has a right to talk to a lawyer and have
3  them present with him while he was being questioned.
4  If he has any -- this is why we always read directly
5  from the card.  So I can -- in the courtroom, I can
6  read directly from it.
7      Q   Anything he says will be used against him?
8      A   Anything he says can be used against him in
9  a court of law.
10     Q   Did you say that that evening?
11     A   It was much more smoother than I said it
12 here today.
13     Q   What happened next?
14     A   I explained -- I asked him if he understood
15 his rights, and I asked him if the jacket we located
16 was his.
17     Q   What did he say?
18     A   He stated no.
19     Q   What happened next?
20     A   When he stated no, I asked him -- I asked
21 him whose jacket it was.  He stated -- no, he nodded
22 towards Nate Barns that was also sitting directly
23 next to him.

OFFICER RODNEY LAYFIELD - DIRECT

1    A.   I believe Ms. Barnes explained that she was
2    babysitting.  At that time as we walked in the
3    apartment, when you immediately walk into the
4    apartment, there is the living room to your left.  I
5    basically walked into the living room.  It is an open
6    area that kind of, I guess it shares the dining room
7    and kitchen area of the apartment.  There was a
8    subject lying on the couch in the living room.
9    Probation Officer Jones, I believe, was actually the
10   first officer in.  He contacted the subject on the
11   couch and Corporal Warren and I proceeded behind Ms.
12   Barnes as she walked into the hallway and she
13   immediately opened the door on the left-hand side, the
14   first door we came to in the hallway.
15   Q.   What were you wearing that night, were you
16   dressed as you are today?
17   A.   No, I was not.  Corporal John Messick was
18   downstairs and outside the apartment when this was
19   going on.  He was a uniformed officer that night.
20   Myself and Detective Warren were, as we call it,
21   dress-down, khaki pants on, usually it is a dark Navy
22   blue or black long-sleeved shirt.  On the exterior of
23   our clothing we have a blue State Police vest that is

OFFICER RODNEY LAYFIELD - DIRECT

1   labeled State Police in the front in gold and has
2   State Police, large letters on the back of this vest.
3       Q.   So you weren't in uniform?
4       A.   That night Detective Warren and myself
5   weren't in uniform.  We were dress-down with the State
6   Police vests on.
7       Q.   What did you do upon reaching the first
8   bedroom?
9       A.   Ms. Barnes opened the door.  As she opened
10  the door, it was dark in the room.  I don't remember
11  any lights being on actually as she opened the door,
12  but we could see the subjects lying on the bed.  Ms.
13  Barnes' facial expression changed as she walked in the
14  room and quickly walked out.  She had explained that
15  this was her daughter's room or either her daughter's
16  room or her daughter was in the bedroom.  And at this
17  time, she began to step out of the doorway.  Corporal
18  Wayne Warren and I entered the room and illuminated
19  the room with the flashlights.
20      Q.   What happened at that point?
21      A.   I observed two subjects lying on the bed.
22  They appeared they were both nude.  They were
23  partially covered with a small blanket -- maybe it was

OFFICER RODNEY LAYFIELD - DIRECT

1   Q.   Who was first to pick up the jacket?
2   A.   Corporal Warren was the first one to pick up
3   the jacket. He picked it up as I was handcuffing
4   Defendant Cannon and about to walk him out of the
5   small room. I going to turn Defendant Cannon over to
6   the probation officer, Probation Officer Timothy
7   Jones. As I was doing this, Detective Warren had the
8   jacket in his possession and was looking into the
9   jacket. I wasn't viewing Corporal Warren as he was
10  doing this. I wasn't very familiar with exactly what
11  was going on, except Corporal Warren explained that I
12  needed to look in this jacket. He was handing the
13  jacket to me as I had the defendant in my hand. All
14  at the same time, I proceeded to turn Defendant Cannon
15  over to Probation Officer Jones. I took the jacket
16  from Detective Warren at that time. The jacket, to
17  me, I was not familiar with what was in the jacket at
18  the time. I had the Defendant Cannon in the room. It
19  was all about the same time I turned him over to
20  Probation Officer Jones, I looked into the jacket and
21  at that time I saw a clear plastic baggie that
22  contained what I believed to be drugs inside of it.
23  Immediately at that time I took the bags of what I

1  suspected to be drugs and placed it in my pocket out
2  of the jacket.
3      Q.   If I could approach with what's been marked
4  as State's B and C for Identification. I ask you to
5  examine them.
6      A.   Yes.
7      Q.   Now, were those two the drugs that were
8  pulled out of that jacket?
9      A.   It's in a different packaging than I recall,
10 but it appears to be the amounts or sizes of the drugs
11 I recovered that evening.
12     Q.   When you say it is different packaging, in
13 what manner?
14     A.   This is packaged in a different package than
15 which I packed it. It is also taped. I see there are
16 smaller bags here as it was packaged with the cocaine.
17     Q.   Did you take pictures of the cocaine as it
18 appeared?
19     A.   Yes, I took pictures of the drugs when I
20 returned back to Troop 4 with it.
21     Q.   Okay. Do you believe -- if you could open up
22 the bag that contains the cocaine --
23     A.   Would you like me to open it?

DAVID WASHINGTON
Official Court Reporter
pg 56

```
1        Q.   If you could.  Is it common in your
2   experience for the Medical Examiner to repackage it
3   after the testing has been done?
4        A.   Yes.
5             MR. CALLAWAY:  Your Honor, may I approach the
6   podium so I can see?
7             THE COURT:  Sure.
8   BY MR. GELOF:
9        Q.   Is that consistent with the way the drugs
10  were found when you had it?
11       A.   Yes.
12       Q.   That, in fact, is the drugs you found in the
13  jacket?
14       A.   Yes, it is.
15            MR. GELOF:  Your Honor, at this time I seek
16  to move what's been marked as, I believe it's C for
17  Identification, the cocaine --
18            THE CLERK:  I believe that's B.
19            MR. GELOF:  -- B for Identification into
20  evidence.
21            MR. CALLAWAY:  Some voir dire, Your Honor?
22            THE COURT:  Go ahead.
23                  EXAMINATION ON VOIR DIRE
```

OFFICER RODNEY LAYFIELD - VOIR DIRE

```
 1   BY MR. CALLAWAY:
 2        Q.   Officer Layfield, I have laid up on the bench
 3   in front of you what appears to be seven individual
 4   wrapped pieces of a white substance; is that correct?
 5        A.   Yes, there are seven here and also five that
 6   were taped.
 7        Q.   Let me finish my question.  Are those seven
 8   that are there, are they identified in any way, any
 9   marking on those at all?
10        A.   They are in the same position or shape they
11   were that night of the arrest, so, yes, sir.  They are
12   not marked.
13        Q.   My question is:  Are they marked in any way?
14        A.   They are not marked.
15        Q.   The other five appear to be inside of tape?
16        A.   Yes, sir.
17        Q.   Is that the way they appeared the night that
18   you took them out of the pocket of that jacket?
19        A.   No, sir.
20        Q.   How are they different now than what they
21   were then?
22        A.   They are taped closed.  They are the same
23   size, amount, but they appear to be wrapped in a
```