napkin of some sort. They are in a different package than what I placed them in.

Q. Were they marked in any other way?

A. They are marked 1 through 5. I believe the initials are F.D., on it.

Q. Any letters of identification on there?

A. 1 through 5, F.D.

MR. CALLAWAY: Your Honor, again with respect to the five that are wrapped in the tape and marked by the Medical Examiner, I have no objection to admitting those, but to the others, I object to their admission based on our previous argument.

THE COURT: Go ahead and mark them and admitted them as we discussed earlier.

THE CLERK: State's Exhibit B for Identification is now admitted as State's No. 5.

DIRECT EXAMINATION CONTINUED

BY MR. GELOF:

Q. What did they weigh that night, Officer? I notice on the envelope it's 4.5 grams?

A. Yes, sir.

Q. That's bag weight?

A. Yes, it was the twelve individual bags

05-577

FILED
AUG - 8 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

weighed and they were contained in the plastic bags. So it was a total weight with the bag and the cocaine.

Q. The F.D. marked on the five, F.D., that is consistent with the Medical Examiner, Farnam Daneshgar?

A. Yes.

Q. And is it also common to get a bag weight and then the Medical Examiner weighs just the substance and there is some degree of less or minus the bags?

A. Yes.

Q. Next drawing your attention to, I guess to C for Identification. If you could open and examine that again.

A. Again, it was the Medical Examiner tape, but it was in the same packaging, the six bags here looks to be in the same packaging they were in that evening and the five samples from the Medical Examiner's Office, that have been taped, are in the same manner as the cocaine was.

Q. And, Officer, is that -- are those the bags of drugs you found in Alonzo Cannon's coat that night?

A. These are the same bags of marijuana we recovered that night.

MR. GELOF: At this time, Your Honor, the State would move into evidence C for Identification.

MR. CALLAWAY: Voir dire, Your Honor?

THE COURT: Go ahead, Mr. Callaway.

EXAMINATION ON VOIR DIRE

BY MR. CALLAWAY:

Q. Officer Layfield, the one, two, three, four, five, six bags of green plant material sitting there on the bench were not marked in any way?

A. No, sir.

Q. Then you have there on the bench what appears to be five that are taped up, inside of tape?

A. Yes.

Q. Is that the way you found them on that particular evening?

A. No, sir.

Q. How did you find them on that particular evening?

A. These bags were packaged the same as the other six bags. They were just marijuana wrapped just in a small plastic baggie with the edges in a small knot, identical to the packaging in the other six.

Q. They were loose at the time like the others?

A. If I can explain the way all the drugs were maintained. When I first had contact, everything was housed in a plastic bag. I believe it was this plastic bag, taped up, a sandwich-sized plastic bag. Within that sandwich-sized plastic bag was eleven loose bags of marijuana. And another plastic bag, approximately this size, that has cocaine, the twelve smaller packages of cocaine. It was all self-contained in one bag, twelve separate bags inside.

Q. But there was eleven bags of marijuana?

A. A smaller bag was open to reveal twelve smaller bags of cocaine.

Q. Were the bags that are taped together, do they have any identifying marks on them?

A. The same as the cocaine did. They are marked 1 through 5 with initials F.D. on them.

MR. CALLAWAY: Your Honor, I have no objections to the five that the Medical Examiner has testified to being marked. I object to the admissibility of the balance.

THE COURT: Okay. Admit them all for the same reasons we discussed earlier. Mark them and

admit them.

THE CLERK: State's Exhibit C for Identification is now admitted as State's Exhibit No. 6.

THE WITNESS: These will be more difficult because I tore the bag getting into it.

DIRECT EXAMINATION CONTINUED

BY MR. GELOF:

Q. Okay. After finding what you believed to be drugs in Mr. Cannon's jacket; what did you do next?

A. At that time it was Detective Warren and I in the room with Ms. Smalls, Shay Smalls.

Q. That's the 15-year-old girl?

A. Yes, the young girl that night. I asked her her age. She looked young to me. And she advised she was 16 that night. And as Detective Warren explained, there was what appeared to be used condoms on the floor and in the bed area. At this time, I asked Mr. Priscilla Barnes, the mother of Shay Smalls, into the room to find out what was going on that evening.

Q. And what happened next?

A. She was brought into the room. She gave us permission to speak to Shay as to what was going on

because I wanted to find out Shay's age. Shay advised she was 16 that night. We asked her about the jacket, the location of where we picked that jacket up and she explained it was Alonzo's jacket. She explained to us that night he was wearing that when she sneaked him into the house.

Q. What happened after Shay told you that that was his jacket and she snuck him in the house?

A. There was a brief conversation in the room with Shay and the mother. Once we were told by Shay it was his jacket and she sneaked him into the house, we exited the room. As we were exiting the room, I briefly explained to Probation Officer Jones that we recovered drugs in the jacket and we exited that room. At that time, I confronted Mr. Cannon, who was handcuffed and seated at a small dinette area. As soon as I exited the room, I directly walked up to him and read him his Miranda Rights at the scene at that time of 0030 hours, 12:30.

Q. What happened after that, after you read the rights?

A. I read the Miranda Rights. At that time I'm not sure if I was holding the jacket or Detective

Warren was holding the jacket. At this period of time, we took the drugs out of the jacket and they were in our possession. I don't recall if I had the jacket in hand or Detective Warren did, but I asked Defendant Cannon about the jacket and he didn't answer me. He said it wasn't his jacket at first. Then he wouldn't answer me. As I questioned him about it, I asked him whose jacket it was. He was handcuffed and seated. He was facing, as if I was Defendant Cannon seated, he was facing the open living room where the jury box is, where Nate Barnes was also seated. And I asked him: Whose jacket was it. He denied it then. He wouldn't answer me. As he was handcuffed and leaning forward, he looked at me and nodded his head towards Nate Barnes, which was seated to his left.

Q. What happened at that point?

A. At this time the mother was outside and she -- or she was in the living room, excuse me, and began to raise her voice towards Nate Barnes, who was seated there. He was a young looking black male. I had very little contact with him other than he was seated there. I believe at this time Probation Officer Jones was questioning him or talking to him

A. Yes. Once back at Troop 4, he was placed into an interview room. He had already been read the Miranda Rights and I reminded him of the Miranda Rights. I asked him about the drugs. He admitted that he had gotten the drugs in Wilmington. He called -- classified the drugs as four nickle bags of marijuana and an unknown amount of cocaine. In the interview he admitted to the possession of the jacket, admitted the possession of the drugs, but he called the drugs four nickle bags of marijuana and an unknown amount of cocaine, which is different from the drugs I recovered. I recovered twelve bags of powder cocaine and eleven bags of marijuana.

Q. Now, when he was interviewed who else was present during this interview?

A. When the interview was conducted, it was just he and I in the interview room at Troop 4.

Q. You felt back at Troop 4 he clearly acknowledged the possession of the marijuana and the possession of the cocaine?

A. Subsequent he admitted the jacket was his. Basically when he was escorting himself out of the residence, he admitted the jacket was his and he began

to stand up to walk out of the room in handcuffs. Once back at the troop, the interview was basically about the drugs, but he admitted the jacket and drugs were his, again, classifying the drugs as eleven -- what they really were.

Q. Approaching with the Court's permission with State's Exhibits F and G for Identification. Are you familiar with State's F and G. for Identification?

A. Yes.

Q. What are they, Officer?

A. They are the Polaroid photos I took of the drug evidence that night. One photograph is of the twelve bags of cocaine outside of the original packaging, sitting next to eleven bags of marijuana in the same bag. And another photo is a photo of all the separate baggies, the same baggies you presented here that were just opened a little while ago, all separated on a table in the Governor's Task Force Office.

MR. GELOF: The State would move F and G for Identification into evidence as State's 7 and 8.

MR. CALLAWAY: No objection.

THE COURT: Mark them and admit them.

MR. GELOF: If he wants the answer to the question, I'll put her back on in rebuttal. It is opening the door whether it is one time or not.

MR. CALLAWAY: I will withdraw the question.

MR. GELOF: I'll 3507 her statement. Her statement was a lot more detailed when she told us the first time. The reason I'm objecting, I'm trying to keep it clean here. If he wants to go down that road, we will put the people on.

MR. CALLAWAY: I will withdraw the question. Your Honor.

THE COURT: Okay.

(Whereupon, counsel returned to the trial table and the following proceedings were had:)

BY MR. CALLAWAY:

Q. Officer Layfield, you indicated that you questioned Mr. Cannon back at the police station after he was arrested?

A. Yes, sir.

Q. It's your testimony that you questioned him concerning the drugs that were found in this jacket?

A. Yes.

Q. Was that conversation that you had with him

videotaped or audiotaped?

A. No, sir, it was not.

Q. Was there anyone else present during that conversation?

A. It was just he and I, sir.

Q. What did Mr. Cannon allegedly say to you about this marijuana?

A. That there was four nickle bags of marijuana.

Q. Was that the truth or a lie?

A. That was incorrect from the amount of marijuana that I had recovered, sir.

Q. You had how many bags of marijuana then?

A. There was --

Q. Purported bags of marijuana?

A. Eleven bags of marijuana.

Q. You are saying that to the ladies and gentlemen of the jury, you are testifying that Mr. Cannon possessed that with the intent to deliver and when you questioned him he didn't know what he had in his pocket?

A. That's correct.

Q. What did he say to you about the number of bags of cocaine that were in his pocket?

in a better fashion, more like: Come see me, I'll give you $1,000, which I think goes along the line that this is authentic. I also note that the defense was given two continuances and told of the availability of the letter to dispute that this is his handwriting. They had the opportunity to do that. That was in his control to obtain the defendant's own handwriting expert, get an expert. After two months and two continuances, this was never provided.

THE COURT: I wanted to flush that out on the record, as well as the reason I didn't go through the Getz analysis.

Do you have any position on that, just the Getz part of it?

MR. CALLAWAY: No, not at this time. It already ended, so there is no need arguing it.

THE COURT: Well, you certainly could if you think it is proper or possible to give a limited instruction as to what purposes the jury may consider it for and what purposes the jury may not consider it for. I thought, given the nature of the letter, that it would be awfully hard to craft. It does not mean I am not willing to listen to what you have to offer.

THE COURT: Mr. Callaway.

THE BAILIFF: Your Honor, you need to move the alternates.

THE COURT: I'm sorry. Move the first alternate.

THE BAILIFF: Ma'am, come down and have this seat, please.

THE COURT: Mr. Callaway.

MR. CALLAWAY: Thank you, Your Honor. Your Honor, may I approach the witness?

THE COURT: Go ahead.

BY MR. CALLAWAY:

Q. Officer Layfield, I hand to you a document and ask if you can take a second and look at that.

A. Yes, sir.

Q. What is that document?

A. That's the warrant that I typed.

Q. The warrant you obtained for Mr. Cannon?

A. That's correct.

Q. And, Officer Layfield, I ask that you turn to the 2nd Page which is the 2nd Page of your affidavit of probable cause and ask you to read that one paragraph to yourself, please.

A. Are you talking about the 2nd Page of all the paperwork here?

Q. Just turn one page.

A. Right here?

Q. Yes, that top page there. Just read it to yourself, that top paragraph there, please.

A. Yes, sir.

Q. Now, as I read your probable cause affidavit that you executed, it indicated that the marijuana that you removed from the pocket of that jacket was wrapped in twelve different bags and had a prescribed weight?

A. Yes, sir.

Q. And the Medical Examiner has brought with him today, he submitted a report that he received eleven bags of green, plant-like material that had a certain weight?

A. That's correct.

Q. Can you explain the difference why there was twelve bags here and only eleven bags that the Medical Examiner examined?

A. When the marijuana was recovered, it was all in one bag and it was emptied. There was eleven bags,

separate bags of marijuana, as I have written in my warrant here. It may read as if there were twelve bags. There was actually only eleven bags of marijuana. The reason why I put twelve, I may have been going off my notes or trying to remember how many. In actuality, there was only eleven bags of marijuana. I think the reason it was classified as twelve separate baggies was because it was all in one bag, maybe going off my notes or off the picture. There was actually eleven separate bags of marijuana that were entered into evidence.

MR. CALLAWAY: May I again approach, Your Honor?

THE COURT: Go ahead.

BY MR. CALLAWAY:

Q. I hand you what's been marked as State's Exhibit No. 8. Is that the photograph that you took?

A. Yes, sir.

Q. When was that photograph taken?

A. That night.

Q. Where was that photograph taken?

A. In the Governor's Task Force Office.

Q. And what does that photograph depict with

respect to the bags of green, plant-like material?

A. It depicts the amount of bags. It's a pretty clear picture.

Q. How many bags do you count there?

A. There is eleven in the photograph.

Q. Okay. So when you wrote the warrant, you put twelve and that is not correct?

A. Inaccurate with the number of bags as eleven. They were contained in twelve bags. However, there was only the eleven bags of marijuana.

Q. There also appears to be a difference in the weight of when you weighed them and a difference in the weight that Mr. Daneshgar has testified to yesterday. Would you explain the difference in the weight?

A. His scales are certified and ours are not, our set of scales, the ones we have at the troop. It is an approximate weight. We send it to the Medical Examiner's Office.

Q. What you weigh it on is like bathroom scales?

A. A little bit better than bathroom scales. It is triple balancing. This not a precise measuring tool like the Medical Examiner weighs.

Q. Again, you indicated there in your warrant for the arrest that there were twelve bags of cocaine?

A. Yes, sir.

Q. Is that an accurate statement?

A. That's an accurate statement because there was twelve separate bags of cocaine.

Q. Again, the difference in the weight as to what you weighed and what the State Chemist weighed, why is there that difference?

A. It might be the scales. I weigh mine with the bag also. I'm not able to cut the bags and measure the product and then place it back into the bags. That may be the difference in the total weight of the product. The difference might be the bag weight. Again, our scales are not as precise as the Medical Examiner's scales.

Q. I ask you to turn back one page to the first page of the affidavit.

A. Yes, sir.

Q. In your probable cause affidavit, do you describe the coat?

A. Yes.

Q. How is it described?