B-146

OFFICER RODNEY LAYFIELD - CROSS

1  whether or not she had seen Mr. Cannon, Mr. Alonzo
2  Cannon?
3       A.   She stated she had not seen Alonzo Cannon.
4       Q.   Now, after making entry into the apartment, I
5  believe you testified that Probation Officer Jones
6  remained in the living room/dining area as you and
7  Officer Warren went down the hall following
8  Ms. Barnes; is that not correct?
9       A.   Yes, sir.
10      Q.   Did you proceed past the first door to the
11 last room in that hallway to look into that room?
12      A.   No.
13      Q.   I believe it is your testimony the first door
14 you came to was the door you looked into?
15      A.   That's correct.
16      Q.   Was either door that you looked into locked
17 where you had to use a coat hanger to unlock them?
18      A.   The door we went in was the first door to the
19 left and that was the door Defendant Cannon and Shay
20 Smalls were in.  That room was not locked.
21      Q.   Did she have to use a coat hanger to get into
22 any doors?
23      A.   She didn't use a coat hanger to get in that

05-577

FILED
AUG - 8 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

DAVID WASHINGTON
Official Court Reporter

pg. 76

| | | |
|---|---|---|
| 1 | Q | And your mom, her name is Priscilla Barnes? |
| 2 | A | Yes. |
| 3 | Q | Does she go by another nickname? |
| 4 | A | Yes. |
| 5 | Q | What's that? |
| 6 | A | Freda. |
| 7 | Q | And that's who the letter is addressed to? |
| 8 | A | Yes. |
| 9 | Q | Just an aside thing now. Are there any |
| 10 | | schools by that apartment building? |
| 11 | A | Yes. |
| 12 | Q | Do you know what school it is? |
| 13 | A | Dunbar Elementary. |
| 14 | Q | An elementary school? |
| 15 | A | (Nodding head indicating yes.) |
| 16 | Q | Now, in the week prior to this date, |
| 17 | | October 11th, when the police come in, that week |
| 18 | | prior to that, had you had occasion -- did you know |
| 19 | | whether or not Alonzo was working? |
| 20 | A | No. |
| 21 | Q | You didn't know or he wasn't working? |
| 22 | A | I don't know. He never told me. |
| 23 | Q | Did you ever hear him talking about a job? |

```
1     A    No.
2     Q    Did he ever tell you that he had to go to a
3  job?
4     A    No.
5     Q    Was there any point in time in the week
6  prior to this incident where you observed him in
7  possession of any currency, U.S. Currency?
8     A    No.
9     Q    You never observed him in possession of a
10 large amount of U.S. Currency, cash?
11    A    Yes.
12    Q    Was it in the week prior to this?
13    A    Yes.
14    Q    Where was that?
15    A    My house.
16    Q    How did that come up?
17    A    Standing there just counting.
18    Q    Do you know about how much he counted?
19    A    Not for sure.
20    Q    What's your best --
21    A    Over 100.
22    Q    Over 100?
23    A    Yes.
```

1   Q    In the week prior to this, had you observed
2   Mr. Cannon -- what, if any, activities had you
3   observed him in the week prior to this at the
4   apartments?
5            MR. CALLAWAY:  Your Honor, may we approach?
6            THE COURT:  Come on up.
7            (Whereupon, counsel approached the bench
8       and the following proceedings were had:)
9            THE COURT:  What are you getting at,
10  Mr. Gelof?
11           MR. CALLAWAY:  Can I ascertain whether or
12  not Mr. Gelof is attempting to elicit from this
13  witness prior bad acts under 404(b), which he is
14  supposed to notify the Court and the defense?  We
15  can have an in camera hearing to determine whether
16  or not it's permissible under 404(b)
17           MR. GELOF:  Mr. Callaway could have had
18  that prior to the last trial.  It was informally.
19           THE COURT:  What is it?
20           MR. GELOF:  Limiting it to the week prior
21  to this.  I don't know what she's going to say now.
22  She's been very reluctant up to this point.  But
23  she's previously told police officers that the week

| | | |
|---|---|---|
| 1 | A | Carvel Gardens. |
| 2 | Q | Carvel Gardens? |
| 3 | A | Yes. |
| 4 | Q | And he was living in Laurel then, back in October? |
| 6 | A | Yes. |
| 7 | Q | Do you know him to be out of town on that particular day? |
| 9 | A | No. |
| 10 | Q | Somewhere not in Laurel? |
| 11 | A | No. |
| 12 | Q | You don't recall how he got to that apartment? |
| 14 | A | No. |
| 15 | | MR. CALLAWAY:  Just one second, Your Honor. |
| 16 | BY MR. CALLAWAY: | |
| 17 | Q | Do you know a Ms. Tee Baldwin? |
| 18 | A | Yes. |
| 19 | Q | How do you know her? |
| 20 | A | His cousin. |
| 21 | Q | Excuse me? |
| 22 | A | His cousin. |
| 23 | Q | Okay.  Did you see her that day? |

```
 1      A    No.
 2      Q    Now, how long before October had you known
 3   Mr. Cannon?
 4      A    A month or two.
 5      Q    A month or two?
 6      A    Uh-huh.
 7      Q    And during that month or two, had he
 8   written you any letters?
 9      A    No.
10      Q    No?
11      A    No.
12      Q    Sent you any cards?
13      A    Yes.
14      Q    How many?
15      A    One.
16      Q    What kind of card?
17      A    Birthday card.
18      Q    And when was that?
19      A    December 3rd.
20      Q    That would have been after October?
21      A    Uh-huh.
22      Q    Do you have that card?
23      A    No.
```

```
 1     Q    Did you keep that card?

 2     A    No.

 3     Q    Was there a note with that card?

 4     A    No.

 5     Q    How was it signed?

 6     A    Boogie.

 7     Q    No letters and one card?

 8     A    Uh-huh.

 9     Q    Now, you were handed a piece of paper, two
10   pieces of paper -- may I have that? -- the D and E
11   of a letter.
12          MR. CALLAWAY:  Do you still have them?  I'm
13   sorry.  May I approach the witness, Your Honor?
14          THE COURT:  You may.
15   BY MR. CALLAWAY:
16     Q    What you have previously been handed has
17   been identified as D and E.  When did you first see
18   these?
19     A    Couple of months ago.
20     Q    Couple of months ago.  And who showed them
21   to you?
22     A    I got them out of the mailbox.  I got it
23   out of the mailbox.
```

```
1     Q    Who is it addressed to?
2     A    My sister's apartment.
3     Q    Who is it addressed to?
4     A    My mother.
5     Q    And you're the one that got it out of the
6  mailbox?
7     A    Yes.
8     Q    Did you own it?
9     A    No.
10    Q    You gave it to your mother?
11    A    Yes.
12    Q    When did you see it again?
13    A    Today.
14    Q    Today?
15    A    Uh-huh.
16    Q    When did you see that letter?
17    A    When did I see it?
18    Q    Uh-huh.
19    A    I seen --
20    Q    When is the first time you saw the letter?
21    A    When she was reading it, I read it, too.
22    Q    And you recognized that as being written by
23  Mr. Cannon?
```

1        from Alonzo Cannon?

2        A    Yes.

3             MR. GELOF:  If I could mark this as State's

4    D and E for Identification.  Can we approach, Your

5    Honor?

6             THE COURT:  Come on up.

7             THE CLERK:  Marked as State's Exhibit D and

8    E for Identification.

9             (Whereupon, counsel approached the bench

10        and the following proceedings were had:)

11            MR. GELOF:  Your Honor, at this point I

12   think the Court knows where the State is going.  We

13   would seek to admit into evidence this letter.  I

14   believe this witness is going to be able to

15   authenticate the handwriting.  She is familiar with

16   it.

17            My question and the reason why I approached

18   is, you know, I understand Mr. Callaway may have an

19   objection to this.  I don't want to speak for him.

20   But one thing that I note is that the envelope has

21   it from an inmate.  Now, one thing that we agreed

22   on, and with Mr. Callaway's review, there was one

23   portion of this letter that we redacted that talk

JONES - Direct

1   juvenile female.

2   Q    And what happened at that point?

3   A    There was a brief argument that ensued where
4   Mr. Cannon denied it was his jacket, and he indicated
5   that, the head movement, to Nate, the young man who
6   was Priscilla Barns' son that originally came out of
7   the back bedroom.

8        I said to Mr. Cannon -- I said, "Do you
9   really expect me to believe -- do you expect the
10  Judge to believe at your violation hearing that you
11  admitted to marijuana, that they found drugs inside
12  that jacket, marijuana inside that jacket? It was in
13  the room with you and the female. It's obviously a
14  male's jacket. Do you expect me and the Judge to
15  believe that you had no knowledge of this? It's not
16  your jacket in the room with you." I asked him, "Do
17  you think we are stupid?" At that point, to the best
18  of my recollection, he looked back at Nate.

19  Q    Who was the juvenile who was found in the
20  other bedroom?

21  A    In the other bedroom. He looked back at
22  Nate, and Nate started to say something about the
23  jacket. At which time, his mother, Priscilla Barns,

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

pg. 85

1  jumped in his face.  She said, "You are not going to
2  lie.  You tell the truth.  You are not going to lie
3  for him."
4      Q    Okay.
5      A    Something to that effect.  I don't remember
6  exact words, but it was rather loud.
7      Q    That was in Mr. Cannon's presence when that
8  was going on?
9      A    That's correct.  That was in Mr. Cannon's
10 presence.
11     Q    What happened next?
12     A    There was a brief delay, and Mr. Cannon had
13 indicated it was Nate's jacket.  I think I made a
14 comment to Officer Chaffee, "If they are not going to
15 tell us whose it is, maybe we need to take both for
16 questioning."  Officer Layfield was still standing
17 there, and after a brief delay, Mr. Cannon indicated
18 that it was his jacket.
19     Q    Did he say anything else at that point?
20     A    No.  He just said, "It's my jacket," and I
21 think --
22          MR. CALLAWAY:  Can you repeat the question.
23 I couldn't hear the question.  I couldn't hear your

JONES - Cross

```
1       Q       Then you went on down to the next bedroom?
2       A       I stated I heard him say to Officer Layfield
3    his name was Nate.  I indicated I thought that was
4    Alonzo Cannon, and I asked Ms. Barns to take me down
5    to the next bedroom while they talked to Mr. Cannon.
6       Q       So you went to the next bedroom and found
7    Nate?
8       A       That's correct.
9       Q       Then you had him go out and have a seat in
10   the living room?
11      A       That's correct.
12      Q       Did you walk him back to the living room?
13      A       I don't believe so.  No, because I could see
14   the living room from where -- not the living room.
15   He walked, sat right down.  There was a chair, like a
16   La-Z-Boy, right next to the dinette table.  I
17   couldn't see the living room from my angle, but I
18   could see that.  So I watched him walk out, sit down.
19      Q       Did you go into the bedroom where Officer
20   Warren and Officer Layfield were?
21      A       Not at that time, no.  I cleared the back
22   bedroom to make sure there was nobody else inside,
23   and then I went back to the bedroom where Officer
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

pg. 87

JONES - Cross

1   Layfield and Officer Warren was at the door. Officer
2   Layfield said, "This is Probation Officer Jones. He
3   is going to take you right now, Mr. Cannon." He
4   said, "He's going to take you right now," to
5   Mr. Cannon, and I took custody of Mr. Cannon at that
6   time.
7        Q    Was he handcuffed at that point in time?
8        A    Yes, he was.
9        Q    Who handcuffed him? Do you know?
10       A    I believe Officer Layfield said he did
11  later.
12       Q    But you have no knowledge who handcuffed
13  him?
14       A    No.
15       Q    When you went to the bedroom, he was
16  handcuffed?
17       A    That's correct.
18       Q    Was he dressed at that time?
19       A    Yes, he was.
20       Q    Where did you go with him?
21       A    I took him to the bathroom at the end of the
22  hall first and took him to the dinette.
23       Q    When you took him into the bathroom -- why

```
 1    did you take him into the bathroom?
 2         A    I wanted to talk to him about how he'd come
 3    out on instant test for drugs.
 4         Q    You asked him to incriminate himself?
 5         A    I asked him a question that probation
 6    officers commonly ask all the time.
 7         Q    The answer would have been incriminating.
 8    Would you ask him to admit whether he violated the
 9    law or not?
10         A    I asked him to admit whether he violated the
11    probation.
12         Q    By?
13         A    By using illegal substances.
14         Q    Which is against the law?
15         A    That's correct.
16         Q    So you asked him if he had violated the law?
17         A    That's correct.
18         Q    Prior to your asking him if he violated the
19    law, did you advise him of his Miranda rights?
20         A    No, sir, I did not.
21         Q    So you then asked him what would happen if
22    he took an instant test?
23         A    That's correct.
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

pg. 39

```
 1      Q    He told you positive for marijuana?
 2      A    Yes.
 3      Q    You asked anything else but marijuana?
 4      A    That's correct.
 5      Q    Later on down the road, you give him an
 6   instant test?
 7      A    That's correct.
 8      Q    What he told you is the truth or a lie?
 9      A    That was the truth.
10      Q    You then walked him back out into the living
11   room?
12      A    That's correct.
13      Q    Then sat him down?
14      A    That's correct.
15      Q    And prior to walking him out into the living
16   room and your conversation with him in the bathroom,
17   did you know of the marijuana and cocaine that was
18   found in that bedroom where he had been originally
19   located?
20      A    No, sir.
21      Q    When did you become aware of the material
22   that they found in the bedroom?
23      A    The door to the bedroom -- I stuck my head
```